EGAN, C. J.
*303 Defendant appeals from a judgment of conviction after he pleaded guilty to two counts of first-degree rape, one count of first-degree sodomy, one count of first-degree sexual penetration, and one count of first-degree sexual abuse, based on acts he committed as a juvenile against his then 11-year-old sister, V. Defendant asserts that ORS 137.690, under which he was sentenced to three 25-year concurrent terms of imprisonment, is disproportionate as applied, in violation of Article I, section 16, of the Oregon Constitution and the Eighth Amendment to the United States *251 Constitution. For the reasons explained in this opinion, we remand for reconsideration of defendant's sentence in light of two Oregon Supreme Court opinions that were issued after defendant was sentenced.
In 2007, when defendant was 12 years old and his sister V was six, defendant digitally penetrated her vagina at least once, repeatedly touched her buttocks and genitals, and repeatedly had V touch his genitals, both on top of and under his clothing. Based on that conduct, defendant was adjudicated as a juvenile on one count of first-degree sexual penetration, one count of first-degree sexual abuse, and one count of third-degree sexual abuse. He was placed under the supervision of the Oregon Youth Authority (OYA), where he received extensive sex-offender treatment.
At approximately age 16, defendant was released to foster care with his grandmother and step-grandfather. During that time, he briefly attended high school but then dropped out to work full time at McDonald's, where he had success as an employee. While living with his grandparents for approximately one year and a half, defendant attended sex-offender therapy and was prohibited from having contact with V. In October 2011, on defendant's motion, the juvenile court terminated its jurisdiction, and defendant's juvenile history was expunged.
In 2012, on his counselor's recommendation, defendant returned to the family home. At that time, defendant was 17 years old and V was 11. Defendant's mother testified at sentencing that she told personnel at OYA that she worked full-time and that there would be times when *304 defendant and V would be unsupervised. She expressed concern to OYA about defendant being at home alone with V and his two other sisters. Defendant's step-grandfather testified that he wondered whether there might be future counseling for defendant as he transitioned back to the home "or a game plan of something to watch for, you know, red flags, you know, things that we should be aware of."
When he had been living at home for only a few months, defendant again abused V, resulting in the instant charges. Defendant waived a jury trial and pleaded guilty, admitting:
"When I was 17, and before my 18th birthday, I had sexual intercourse with my 11 year old sister, including oral sex and digital penetration of her vagina and sexual touching of her vagina."
At the sentencing hearing, the court heard testimony from Steinhauser, a clinical and forensic social worker and expert in sexual misconduct who had evaluated defendant. She described defendant as "basically a good kid who has suffered a great deal of trauma and emotional deprivation in his life who has acted out." She testified that defendant is "intellectually low-functioning," with severe learning disabilities. Steinhauser conducted a psychosexual evaluation of defendant to assess his risks of reoffending. She reported that defendant demonstrated "no significant sexual interest in male or female children at all, nothing in teens." She testified that
"he did not demonstrate any significant sexual interest in children or teens and did not identify any traits consistent with psychopathy, which is a significant risk factor for a sexual offender population."
Steinhauser testified that her testing showed that defendant does not have characteristics that are typically predictive of relapse, including prior criminal convictions, impulsivity, delinquency, and high deviant sexual arousal. In the absence of those factors, Steinhauser opined, defendant was an excellent candidate for treatment and was at low risk of reoffending, provided he did not have access to the victim. Steinhauser testified that the risk factors that defendant did demonstrate could be treated with therapy.
*305 On cross-examination, the prosecutor asked Steinhauser to address whether it is possible to determine when a juvenile has a propensity for continued sexual offending. Steinhauser responded that the task was challenging but that risk factors have been identified that have a high correlation with future reoffending. Based on its colloquy with the witness, the sentencing court was also interested in defendant's risk of reoffending. The court asked Steinhauser if V
"is the beginning and end of the universe of potential victims? In other words, if he is out and in the community and let's say *252 he has children or gets involved with a woman who has children or any other number of circumstances where he might be exposed to children."
Steinhauser testified that V was "a convenient and available victim. Opportunity presented itself and there had been a reinforcement history there that drove the arousal," but that defendant "simply does not have the skill set or the level of risk taking in his history, his repertoire to go outside the home and develop relationships with young kids or to blitz attack." In response to the trial court's question about whether defendant might present a risk to others, Steinhauser testified that she did not believe that defendant would reoffend with someone other than the victim. But she cautioned:
"There's always risk. We can't eliminate risk completely, but by targeting the criminogenic risk factors for re-offense, those idiosyncratic criminogenic risk factors that are changeable, the dynamic risk factors that are listed here, we increase the likelihood he will more effectively manage his sexual behavior problems as an adult. But there is never, never a guarantee for anybody who has a behavioral management problem if they're going to be able to abstain from the behavior for the remainder of their lives."
The court knew that three of defendant's sex offenses were subject to a 25-year minimum sentence under ORS 137.690,[1] and asked the witness "not just what would we *306 provide [defendant] in a perfect world with unlimited funding, but what can I actually order that will actually happen that will keep people safe in the community?" The witness responded:
"I agree his behaviors should be consequated. What he did was egregious. It was unacceptable. He had free will, he had the benefit of new learning. We can't deny the seriousness of what he did. But there * * * are mitigating factors and I think they should be taken into consideration.
"At some point the effectiveness of * * * punishment as a deterrent won't [be] effective. Twenty-five years is a long time when you're 19. I would say something in the range of ten, fifteen years maybe? But 25? He'll get out in his forties. He's already deficient socially, vocationally. You realize how difficult rehabilitation will be and reintegration into the community will be at that time and how much more difficult it will be to address these risk factors? He's malleable now, he's still young.
"THE COURT: In the highly imperfect real world in which we live, if I give him ten to fifteen years as opposed to some longer sentence, is he going to get the treatment that you're recommending * * *
"THE WITNESS: * * * [N]ot at the prison system, but he will when he gets out. He-he will be mandated, as all sexual offenders are, to participate in the treatment program. And when he finds himself in the community corrections department, they will identify his criminogenic needs, they will do a Stable, they'll do a Static, they will look at the past records, they'll identify his criminogenic needs and pair him to a provider that properly-that is able to meet those needs. This is standard operating procedure. Best fit, it's called best fit."
In essence, the witness explained, defendant should be punished, but the deterrent value of imprisonment would diminish after a certain length of time, and a shorter sentence would give defendant the best chance for rehabilitation outside of prison after his release. Steinhauser testified that a lengthy prison term would be harmful to defendant, because, during that time, he could not have specialized treatment targeting his criminogenic risk factors and would be at risk of abuse because of his age, vulnerability, and the nature of his offenses.
*307 As noted, three of defendant's offenses, first-degree rape, first-degree sodomy, and first-degree sexual penetration, were subject to sentencing under ORS 137.690(1), which provides that "[a]ny person who is convicted of a major felony sex crime, who has one (or *253 more) previous conviction of a major felony sex crime, shall be imprisoned for a mandatory minimum term of 25 years." The state recommended a sentence of 475 months, comprised of a Measure 11 mandatory minimum sentence of 100 months on Count 1 (first-degree rape); a mandatory sentence of 25 years under ORS 137.690 on Count 2 (first-degree rape), to be served consecutively to the sentence on Count 1; a mandatory sentence of 25 years under ORS 137.690 on each of Counts 3 and 4 (first-degree sodomy; first-degree sexual penetration), to be served concurrently with the sentence on Count 2; and a consecutive Measure 11 mandatory minimum sentence of 75 months on Count 5 (sexual abuse in the first degree).
Article I, section 16, of the Oregon Constitution provides that "all penalties shall be proportioned to the offense[.]" Defendant raised an as-applied proportionality challenge to the imposition of the ORS 137.690 mandatory minimum 25-year sentences on Counts 2, 3, and 4. Additionally, citing the United States Supreme Court's opinions in Roper v. Simmons , 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (the Eighth Amendment forbids the imposition of the death penalty on a juvenile), and Miller v. Alabama , 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012) (the Eighth Amendment forbids the imposition of a true-life sentence on a juvenile), and our opinion in State v. Wilson , 243 Or. App. 464, 259 P.3d 1004 (2011) (sentencing court can consider a defendant's diminished mental capacity in determining whether a mandatory minimum sentence is constitutional), defendant raised an Eighth Amendment challenge, contending that, in view of defendant's circumstances, the imposition of the mandatory 25-year sentences is disproportionate. Defendant urged the court not to impose the mandatory minimum sentences, contending that this case presents one of those rare circumstances where imposition of a statutory minimum penalty "shocks the moral sense" of reasonable people. See State v. Rodriguez/Buck , 347 Or. 46, 58, 217 P.3d 659 (2009).
*308 The state responded:
"[U]nder Ballot Measure 73, which was later codified into ORS 137.690, the citizens of Oregon, the voters of Oregon decided that a minimum sentence of 300 months was appropriate, that this was exactly what they wanted to happen to any person, not just adults, but any person who was convicted of a subsequent sex crime. So the State's argument is that this Court should defer to the wishes of the voters here in Oregon.
"And Your Honor, I don't know if the Court wants to go into a Rodriguez/Buck analysis, because of course in Rodriguez/Buck , the facts in that-those cases are substantially different. But in those cases what the court stated is that in looking to see whether or not the imposition of sentence would shock the moral sense of reasonable people, the court should look at a comparison of the penalty and the gravity of the crime. Two, a comparison of the penalties imposed for other, related crimes. And three, the criminal history of the defendant.
"So looking under the first element, a comparison of the penalty and the gravity of the crime, in both Rodriguez and in Buck , those are cases where it was sex abuse. And of course, sex abuse can be committed a number of ways, you know, the touching of the breasts, the touching of the buttocks, in ways that can be different levels of-there's a spectrum of abuse, whereas in this case unlawful sexual penetration and rape are very specific; there's not a broad spectrum. It either is or it isn't. And so the State believes that under (1), looking at a comparison of the penalty and the gravity of the crime, the State would definitely meet that.
"Two, a comparison of the penalties imposed for other, related crimes. And again, this is a case where the voters have said if there are-if you're a repeat sex offender, if you do this more than one time, you need to be held to a higher level.
"And three would be the criminal history of the defendant. And Your Honor, the State recognizes that at this point as * * * the defendant sits before you, he has no criminal history. I would, however, encourage the Court to look at what's been laid out both by Defense and by the State as to *254 his prior criminal activity, if you will. So those things he's been adjudicated for, which of course we can't use to *309 say that those are prior convictions, but still goes to paint a picture of who this defendant is that sits before you. This isn't somebody who, you know, had sex with his 11-year-old sister one time. This is a repetitive course of action in this family."
Discussion ensued concerning the extent to which the state could rely on defendant's juvenile adjudications at sentencing. Defendant argued that, because the adjudications had been expunged, they could not be considered in evaluation of the as-applied challenge. The state responded:
"What the State is arguing is that under Wilson one of the things that the court said is that the trial court * * * can take the fact of a diminished mental capacity into consideration at the time of sentencing.
"Based on the evidence that the Defense has put on, i.e. , that defendant needed an IEP, he had learning disabilities, he had diminished mental capacity, the State believes it's only appropriate to say, 'By the way, he did these other things.' The fact that there's no longer an adjudication on the record doesn't mean that those acts happened [sic ]. And again, just to clearly state for the record, the State is not saying that because Defendant sexually violated his sister in 2007 that that moves him up the grid or that he is somehow more criminally liable. The State is only using that under a Rodriguez/Buck analysis."
Thus, the state urged, just as defendant's learning disabilities and diminished mental capacity were relevant in the Rodriguez/Buck analysis, defendant's past juvenile adjudications were also relevant.
In rejecting defendant's contention that the prior adjudications could not be taken into account, the court explained:
"[T]o the extent that the Court has any discretion * * * I don't believe that I can disregard the real world. * * * Let's say you have somebody who's convicted of arson and they have a juvenile history of setting fires * * * and maybe they never were adjudicated for that offense, but when you're looking at 'How dangerous is this arsonist?' I don't think you would ignore that real-world information if everybody concedes that it's accurate and it's true. So those are my thoughts at this point."
*310 Defendant then addressed his contentions relating to proportionality under federal law, including the unique circumstances of a juvenile offender as addressed by the court in Roper :
"The Supreme Court ruled that a juvenile has a lack of maturity and an underdeveloped sense of responsibility.
"The court ruled that juveniles are prone to impetuous and inconsiderate actions and decisions.
"The court ruled that juveniles are more vulnerable or susceptible to negative influence and outside pressures.
"And lastly, the character of the juvenile is not as well formed as that of an adult.
"For most teens, risky or antisocial behaviors are fleeting. They cease with maturity as individual identity becomes settled. Only a relatively small proportion of adolescents who experiment in illegal activities developed entrenched patterns of behavior, problem behavior that persists into adulthood.
"So Your Honor, that's exactly what we have here. We have a juvenile who has some learning disabilities, some issues in the range of being delayed, who has not formed yet an adult character, who has been susceptible to outside influences, and who was an underdeveloped sense of maturity and responsibility."
The sentencing court did not offer a lengthy explanation for its ruling rejecting defendant's as-applied constitutional challenge. The court explained simply:
"[B]oth parties have set forth their arguments very well and cited the appropriate case law. I just do not believe that the precedent is out there. It's possible that either through this case or some other cases appellate courts will go that way, but at this point based on what I see of the appellate decisions, I am not prepared to *255 rule ORS 137.690 unconstitutional as applied in this case."[2]
In light of the sentencing court's rejections of defendant's constitutional challenges, defense counsel urged the court not to impose a total sentence exceeding the mandatory *311 25-year minimum required by ORS 137.690. But, based on its lack of certainty as to whether defendant might reoffend, the court determined that a lengthier sentence was appropriate and accepted most of the state's recommendations, giving defendant "a little bit of a break," and imposing a total of 436 months in prison.[3] *312 On appeal, defendant contends that the case must be remanded for reconsideration of defendant's as-applied constitutional challenge, and we agree. In State v. Wheeler , 343 Or. 652, 671, 175 P.3d 438 (2007), the court reiterated that it is the province of the legislature (and the people acting through the initiative process) to establish the penalties for violations of the various criminal statutes, and that the court will hold unconstitutional a legislatively mandated sentence only in rare circumstances, when the penalties lack a reasonable basis such that their imposition would "shock the moral sense of reasonable people." 343 Or. at 677, 175 P.3d 438. In Rodriguez/Buck , the court identified three nonexclusive factors that guide the determination whether a sentence violates Article I, section 16, of the Oregon Constitution because it "shocks the moral sense of reasonable people":
"(1) a comparison of the severity of the penalty and the gravity of the crime; (2) a comparison of the penalties imposed for other, related crimes; and (3) the criminal history of the defendant."
347 Or. at 58, 217 P.3d 659. In Rodriguez/Buck , the court said that an offender's personal characteristics are relevant to the first factor of the proportionality determination-a *256 comparison of the severity of the penalty and the gravity of the offense. 347 Or. at 62, 217 P.3d 659. But the court did not elaborate on the types of characteristics personal to a defendant that might be relevant to the proportionality analysis. Defendant contends that his diminished mental capacity, severe learning disabilities, and immaturity are personal characteristics that the trial court should have considered under the first Rodriguez/Buck factor.[4]
We first address defendant's contention relating to his diminished mental capacity and severe learning disabilities. In Wilson , 243 Or. App. at 468, 259 P.3d 1004, which the parties cited to the sentencing court, we held that, under Rodriguez/Buck , a court can consider a defendant's diminished mental capacity in determining whether a mandatory minimum sentence is constitutional. Thus, at the time of sentencing, *313 our case law held that a defendant's diminished mental capacity was a relevant consideration that can be taken into account in determining the constitutionality of a mandatory minimum sentence. But after defendant was sentenced, the Supreme Court decided State v. Ryan , 361 Or. 602, 624, 396 P.3d 867 (2017), in which the court held that a person's intellectual disability is a relevant personal characteristic that, if raised, must be considered in assessing the relationship between the penalty and the offense. The court explained that, "[t]o the extent that an offender's personal characteristics influence his or her conduct, those characteristics can affect the gravity of the offense." Id. at 616, 396 P.3d 867. Because the test for proportionality under the Eighth Amendment is similar to that under Article I, section 16, at least in its comparison of the gravity of the offense and the severity of the penalty, the court referred for guidance to decisions of the United States Supreme Court and other courts following them. See Atkins v. Virginia , 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (Eighth Amendment prohibits execution of intellectually disabled offender). The court acknowledged that, to that point, federal courts had limited Atkins 's application to offenders otherwise subject to death penalty sentences. The court departed from that view, however, concluding that, in view of the holding in Rodriguez/Buck that an offender's personal characteristics are relevant in making a proportionality determination, "[e]vidence of an offender's intellectual disability therefore is relevant to a proportionality determination where sentencing laws require imposition of a term of imprisonment without considering such evidence." Ryan , 361 Or. at 620-21, 396 P.3d 867. Therefore, the court held, if presented with the issue, in making a proportionality analysis under Article I, section 16 and Rodriguez/Buck , "a sentencing court must consider a defendant's intellectual disability in comparing the gravity of a defendant's offense with the severity of a mandatory prison sentence on such an offender." Id. at 621, 396 P.3d 867.
As to how that consideration should affect the proportionality analysis, the court in Ryan explained that, under a proportionality test that "asks whether a particular sentence for a particular offender would shock the moral sense of reasonable people," a one-size-fits-all approach is *314 not appropriate; "the analysis must be case specific." Id. at 622, 396 P.3d 867. Thus, the court held:
"[A] sentencing court's findings, among factual considerations, as to an intellectually disabled offender's level of understanding of the nature and consequences of his or her conduct and ability to conform his or her behavior to the law, will be relevant to the ultimate legal conclusion as to the proportionality-as applied to the offender-of a mandatory prison sentence."
Id. at 621, 396 P.3d 867. Here, the trial court found that defendant is developmentally delayed, and the parties raised the issue of defendant's intellectual disability in the context of defendant's as-applied challenge. But, based on our opinion in Wilson , the trial court understood that defendant's intellectual disability was a characteristic that could be considered. The court did not have the benefit of Ryan , and its holding that a defendant's intellectually disability must be considered, and is not possible to determine *257 from the record whether the court did in fact consider it in its evaluation of defendant's as-applied challenge. For that reason, we remand the case for resentencing.
Because the question of the relevance of defendant's youth to the proportionality analysis is likely to arise on remand, we address briefly the Supreme Court's recent opinion in Kinkel v. Persson , 363 Or. 1, 417 P.3d 401 (2018). In that case, the defendant, who pleaded guilty to four counts of murder and 24 counts of attempted murder, committed when he was 15, sought a categorical rule that, when a juvenile offender's aggregate sentence is equivalent to life without possibility of parole, the severity of the sentence, coupled with the characteristics of juvenile offenders, will always lead to the conclusion that the sentence violates the Eighth Amendment.
In rejecting the defendant's contention, the court reasoned that, although opinions of the United States Supreme Court have imposed categorical sentencing limitations on juvenile offenders, see Miller , 567 U.S. at 479, 132 S.Ct. 2455 (only those juveniles who commit a murder that reflects irreparable corruption rather than the transience of youth are eligible for a life sentence without possibility of parole);
*315 Graham v. Florida , 560 U.S. 48, 75, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010) (juveniles convicted of a nonhomicide offense may not be sentenced to life imprisonment without the possibility of parole); Roper , 543 U.S. at 571, 125 S.Ct. 1183 (juveniles are not eligible for the death penalty), to date they have not addressed minimum sentences other than true life or aggregate sentences for multiple convictions that are the equivalent of true life. Kinkel , 363 Or. at 17-20, 417 P.3d 401.
But the Oregon Supreme Court reasoned in Kinkel , citing Miller , that it did not need to address those questions either, because the sentencing court's findings led the court to conclude that the defendant fell within the small category of juvenile offenders who may be sentenced to life without the possibility of parole for a homicide, by virtue of having committed a crime that reflects irreparable corruption rather than the transience of youth. Id. at 24, 417 P.3d 401. In reaching that conclusion, the court devoted considerable discussion to the relevance of the transience of youth as a mitigating factor in sentencing.
The Oregon Supreme Court quoted from the United States Supreme Court's opinion in Roper , in which the Court identified relevant differences between juvenile and adult offenders who commit the same offense: Juveniles, the court said, more often lack maturity and have an underdeveloped sense of responsibility; they are more vulnerable or susceptible to negative influences or outside pressures; and their personality traits are more transitory, less fixed, than those of adults. 363 Or. at 24, 417 P.3d 401 (citing Roper , 543 U.S. at 569-70, 125 S.Ct. 1183 ). It is precisely because the signature qualities of youth are generally transient and amenable to reformation, the Oregon Supreme Court said, "that a juvenile's commission of a heinous offense usually does not signal an irretrievably depraved character in the same way that an adult's commission of the same offense does." Id. at 25, 417 P.3d 401. The court also cited with approval an article cited by the Court in Roper , in which the author concluded that, because most juvenile antisocial behavior does not reflect bad character but instead reflects transient immaturity, juveniles generally should not be subject to the same punishments imposed on adults for the same crimes. Id. at 25-26, 417 P.3d 401. Those considerations led the court to conclude:
*316 "[T]he transience of youth-the recognition that most juvenile crimes are attributable to traits that will disappear or significantly diminish as a youthful offender ages-is the primary characteristic that justifies a constitutional distinction between the permissible punishment for a juvenile and an adult whose crimes are otherwise identical."
363 Or. at 26, 417 P.3d 401.
As the Oregon Supreme Court noted, in Roper , Miller , and Graham , the Court did not address the constitutional proportionality of juvenile sentences outside of the context of the death penalty or life in prison without the possibility of parole. 363 Or. at 17-20, 417 P.3d 401. The court's statement in Kinkel *258 that the transience of youth "justifies a constitutional distinction between permissible punishment for a juvenile and an adult whose crimes are otherwise identical," id. at 26-27, 417 P.3d 401, signals to us that the court regards the "transience of youth" as a factor that must be considered under the Eighth Amendment in addressing the constitutional proportionality of a mandatory minimum sentence like the one imposed on defendant. The sentencing court did not have the benefit of Kinkel when it imposed sentence in this case. On remand, the sentencing court will have the broad authority to reconsider defendant's entire sentence, State v. Partain , 349 Or. 10, 19, 239 P.3d 232 (2010), and will have an opportunity to consider the transience of defendant's youth and any concomitant susceptibility to reformation.
Remanded for resentencing; otherwise affirmed.

Under ORS 137.690(1),
"[a]ny person who is convicted of a major felony sex crime, who has one (or more) previous conviction of a major felony sex crime, shall be imprisoned for a mandatory minimum term of 25 years."

The court also rejected defense counsel's motion to impanel a jury to determine whether the 25-year sentence "shocks the moral sense of reasonable people."

Rather than the state's recommended fully consecutive 75-month sentence on Count 5, the court imposed only 36 months of the sentence consecutive to Count 2, with the remainder to be served concurrently. The court gave a considered explanation of its ruling:
"Clearly, I have the authority to impose consecutive sentences as these were separate incidents. There are a number of factors on both sides of that argument which have been ably argued by Counsel. [Defendant] is young. He is developmentally delayed. He apparently was a victim of abuse himself. Does not have a lot of other criminal involvement, none other than the prior offenses against the same victim, which, as we've discussed, legally don't exist but factually do. You know, has been responsible at work, has family support.
"Dr. Steinhauser has certainly made a good case that perhaps he has a malpractice case against OYA, but that is something for another day.
"And on the other hand, we have repeated victimization of an extremely vulnerable victim here. Again, legally the prior adjudications are not convictions. I don't believe I could ignore, just as Dr. Steinhauser can't ignore in looking at [defendant] as a whole at the fact that there were prior offenses against * * * this victim that we know for a fact that those things occurred.
"While it's clear that there's plenty of room for criticism as to what kind of treatment [defendant] received, there is no doubt that he certainly did receive some intervention and certainly efforts were made to make it clear to him that this kind of behavior is totally and completely unacceptable. And even given the lack of a perfect treatment program, the lack of a good after-care program, * * * somebody's apparently rather poor judgment in allowing him to move back into close proximity with his victim, even including all of those things, he clearly knew that it's not acceptable to sexually violate your little sister, it's not acceptable to sexually violate any little girl. So these are very, very serious offenses.
"I wish I was really persuaded that we knew about how to predict recidivism. I certainly considered Dr. Steinhauser's testimony, considered the portions of the treatise that she was cross-examined on. You know, what we tell jurors is that you're not required to accept expert testimony just because it is offered by an expert. I'm-and I'm not saying that-certainly Dr. Steinhauser didn't get up here and lie to me, nor did she have a bias. I'm just not persuaded that anybody sitting here today can really tell me how dangerous [defendant] is in the future.
"And when it comes right down to it, I don't know any way to determine his dangerousness other than to know that he molested his sister repeatedly and then he did it again repeatedly. And you know, I understand the evidence about this is a victim that's available, this is a victim that's convenient, I mean, there will be other little girls that are convenient or available at some point sometime."

Defendant also makes arguments under the second Rodriguez/Buck factor, but those arguments were not raised below and we therefore do not consider them.