Argued and submitted April 11, 2022, reversed and remanded June 28, 2023

# STATE OF OREGON,
*Plaintiff-Appellant,*

*v.*

# VANESSA AMADA GONZALEZ,
*Defendant-Respondent.*

### Marion County Circuit Court
### 17CR78352; A173971

534 P3d 289

Defendant was convicted in a bench trial of first-degree arson, ORS 164.325 (Count 6), and third-degree assault, ORS 163.165 (Count 12). At sentencing, defendant argued that the Ballot Measure 11 mandatory minimum 90-month sentence for first-degree arson would be unconstitutionally disproportionate as applied to her, in violation of Article I, section 16, of the Oregon Constitution and the Eighth and Fourteenth Amendments to the United States Constitution. The trial court agreed, concluding that, under the "totality of the circumstances," including defendant's "psychological paradigm," applying the 90-month mandatory minimum prison sentence required under ORS 137.700(2)(b)(A) would be unconstitutionally disproportionate under Article I, section 16. Having so concluded, the court sentenced defendant to 60 months' probation instead. The state appeals, assigning error to the trial court's determination that the 90-month mandatory sentence was unconstitutionally disproportionate. *Held*: Under *State v. Rodriguez/Buck*, 347 Or 46, 217 P3d 659 (2009), and the cases that followed, the facts found by the trial court in its consideration of the totality of the circumstances do not objectively speak to the issue of whether a 90-month mandatory sentence is proportional to the crime of first-degree arson. Because current case law restricts the consideration of a defendant's personal characteristics to those affecting intellectual capacity, such that a defendant's intellectual capacity is comparable to that of a child, which does not apply in this case, and because the severity of the mandated penalty does not outweigh the gravity of defendant's crime, the trial court erred in concluding that the 90-month sentence violated Article I, section 16.

Reversed and remanded.

Audrey J. Broyles, Judge.

Jennifer S. Lloyd, Assistant Attorney General, argued the cause for appellant. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Eric Johansen, Deputy Public Defender, argued the cause for respondent. Also on the brief was Ernest G. Lannet,

Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Before Powers, Presiding Judge, and Lagesen, Chief Judge, and Hellman, Judge.

LAGESEN, C. J.

Reversed and remanded.

**LAGESEN, C. J.**

In an attempt to take her own life, defendant set fire to her apartment building. Five of her neighbors were home at the time; two had to jump from a second-floor window to escape the fire, one after being severely burned. The fire caused extensive damage.

For that conduct, she was convicted in a bench trial of first-degree arson, ORS 164.325 (Count 6), and third-degree assault, ORS 163.165 (Count 12). Although defendant was also charged with five counts of attempted first-degree murder and one count of second-degree assault, the trial court acquitted her on those charges, having found that defendant did not intend to harm or kill the other residents of the apartment when she set the fire. At sentencing, defendant argued that the Ballot Measure 11 mandatory minimum 90-month (7.5 year) sentence for first-degree arson would be unconstitutionally disproportionate as applied to her, in violation of Article I, section 16, of the Oregon Constitution and the Eighth and Fourteenth Amendments to the United States Constitution. The trial court agreed, concluding that, under the "totality of the circumstances," including defendant's "psychological paradigm," applying the 90-month mandatory minimum prison sentence required under ORS 137.700(2)(b)(A) would be unconstitutionally disproportionate under Article I, section 16. Having so concluded, the court sentenced defendant to 60 months' probation instead.

The state appeals, assigning error to the trial court's determination that the 90-month mandatory sentence was unconstitutionally disproportionate. For the reasons that follow, we conclude that under the legal framework established by the Supreme Court, this case does not present "the rare circumstances" in which the legislatively prescribed sentence for defendant's conviction contravenes the Article I, section 16, proportionality requirement. We therefore reverse and remand.

## STANDARD OF REVIEW

We review the trial court's conclusion that defendant's sentence was unconstitutional under Article I, section 16, for legal error. *State v. Ryan*, 361 Or 602, 614-15, 396

P3d 867 (2017). In conducting that review, we are bound by any findings of historical fact that the trial court may have made, if they are supported by evidence in the record. *Id*. at 615. To the extent we state historical facts in the course of this opinion, we do so in accordance with that standard.

## LEGAL FRAMEWORK

At issue is whether the statutorily required 90-month term of incarceration for first-degree arson is unconstitutionally disproportionate under Article I, section 16, as applied to defendant.[1] Article I, section 16, requires that "all penalties shall be proportioned to the offense." The provision "embodies the basic proportionality concept that more serious crimes should receive more severe sentences than less serious crimes and vice versa." *State v. Bartol*, 368 Or 598, 621, 496 P3d 1013 (2021) (internal quotation marks omitted). The application of a legislatively specified penalty violates the provision only if the penalty "is so dispropor-tionate, when compared to the offense, so as to 'shock the moral sense' of reasonable people." *State v. Rodriguez/Buck*, 347 Or 46, 58, 217 P3d 659 (2009). This standard, the court has said, is one that will be satisfied rarely. That is because, in general, determining the appropriate penalty or range of penalties for a crime is the province of the legislature (or the people, when acting in their legislative capacity), and "[i]t is not the role of this court to second-guess the legisla-ture's determination of the penalty or range of penalties for a crime." *Id*.

The proportionality test, as the Supreme Court itself has recognized, is somewhat nebulous.[2] The court

---

[1] As mentioned, defendant also challenged her sentence under the Eighth Amendment, but did not develop an argument distinct from her Article I, section 16, argument. To the extent defendant's Eighth Amendment challenge to the sen-tence is a live dispute, it fails for the same reasons that her Article I, section 16, challenge ultimately fails.

[2] In *Ryan*, 361 Or at 622, the court acknowledged that the test is inherently difficult to apply:

"The fact that a comparison of the gravity of an offense and the severity of its penalty involves factual considerations does not mean that it is unmoored in principle. Nor do challenges posed by the application of such a test justify rejecting it."

nonetheless has stated that "at least" three guideposts govern the assessment:

> "(1) a comparison of the severity of the penalty and the gravity of the crime; (2) a comparison of the penalties imposed for other, related crimes; and (3) the criminal history of the defendant."

*Id*.

Regarding the first factor, which plays the most significant part in this case, the primary determinant of a penalty's severity is the amount of time the offender must spend incarcerated for the conviction. *Rodriguez/Buck*, 347 Or at 60. To weigh the gravity of the crime, a court must consider the description of the prohibited conduct in the statute and the range of conduct encompassed in that prohibition, then consider the circumstances of the defendant's specific offense to locate the defendant's conduct on the scale of prohibited conduct. *Id*. at 59. The particular facts of a defendant's criminal conduct are more significant when applying a statute that criminalizes a "broad range of activity." *Id*. at 61. That is particularly true when the specific conduct is relatively minor in the context of the full range of activity encompassed by the statute. *Id*. When assessing the "range of activity,"

> "a court may consider, among other things, the specific circumstances and facts of the defendant's conduct that come within the statutory definition of the offense, as well as other case-specific factors, such as characteristics of the defendant and the victim, the harm to the victim, and the relationship between the defendant and the victim."

*Id*. at 62.

In addition, and pertinent to the issue in this case, the Supreme Court has held that an offender's personal characteristics may, in some circumstances, be relevant to the assessment of an offense's gravity and its relationship to the severity of the penalty. *Ryan*, 361 Or at 616. So far, the court has identified only one specific personal characteristic that is legally relevant under the first factor: an offender's intellectual disability. *Id*. at 621. Intellectual disability is relevant because it can render an offender less culpable for

criminal conduct. *Id.* That is because an intellectual disability can affect an "offender's level of understanding of the nature and consequences of his or her conduct and ability to conform his or her behavior to the law." *Id.* Specifically, if, as a result of an intellectual disability, an offender's "age-specific intellectual capacity [falls] below the minimum level of criminal responsibility for a child," then it may "be arguably unconstitutional" to sentence an offender as an adult. *Id.* at 625-26. As we understand it, that flows from the fact that the legislature has recognized a societal standard that treats children as less culpable than adults. That legislatively acknowledged societal standard, according to the court, warrants treating people who have the intellectual capacity of a child as less culpable than people who have the intellectual capacity of an adult for purposes of Article I, section 16. As the court explained,

> "Moreover, it is undisputed that defendant has significantly impaired adaptive functioning, such that he functions—as it pertains to standards of maturation, learning, personal independence, and social responsibility—at an approximate mental age of 10, two years below the minimum age for establishing criminal responsibility of a child under Oregon law. *That legislative pronouncement is relevant here because it is objective evidence of a societal standard that eschews treating persons with the attributes of a preteen child as if they were normally abled adult offenders.*"

*Id.* at 623-24 (emphasis added; citation omitted).

The court's recognition that an offender's intellectual disability is relevant to the proportionality analysis does not equate to a general rule that an offender's other individual characteristics are relevant to the analysis. As the concurring opinion explained, the holding in *Ryan* is a narrow one that necessarily rejected a broader rule proposed by the defendant. After describing the defendant's expansive theory—one that would allow for consideration of all individual characteristics potentially bearing on culpability—the concurring opinion explained that "that open-ended review of the constitutionality of a sentence mandated by statute is unlikely to have been intended by the framers of Article I, section 16, and the majority wisely adopts a

narrower approach." *Id*. at 634 (Balmer, C. J., concurring). The concurring opinion further emphasized that it agreed with the defendant that courts *should* have the discretionary latitude to take into account an offender's characteristics and circumstances when determining an appropriate sentence. That authority, however, would need to come from the legislature. That is because Article I, section 16, does not confer upon courts the power to make discretionary judgments in sentencing based on the individual facts of the case:

> "Again, I agree with defendant that courts should have greater discretion than they do in various aspects of the sentencing process, including consideration of age, maturity, psychological condition, and other factors. The mandatory sentences required by Measure 11 should be revisited and revised to allow judges, within reasonable parameters and based on specific factors, greater flexibility to impose sentences that are more appropriate to the defendant, the victim, and the crime. The requirement of Article I, section 16, that the penalty be proportioned to the offense has a role to play in rare cases, but it is of limited utility in ensuring that criminal sentences are appropriate in the great majority of cases.

> "Instead of defendant's sweeping theory, the majority adopts a narrow, but principled, approach to the issue presented in this case[.]"

*Id*. at 634-35.

## FACTUAL AND PROCEDURAL BACKROUND

Having supplied the legal framework for evaluating defendant's claim that her 90-month sentence for arson violated Article I, section 16, we turn to the facts of the case at hand. As noted, defendant's convictions stemmed from her act of setting fire to her apartment building in a suicide attempt, which was not her first. The day of the fire, defendant had planned to attempt suicide by overdose but was concerned that someone would try to intervene, as they had with her earlier attempts. To minimize the possibility that someone would intervene, instead of taking pills, she piled "a dresser turned on its side, children's toys, clothes, birthday cards, household items, the contents of her life

discarded" outside the entrance to her apartment and lit it on fire. She then shut her front door and sat in a window of her apartment while she let it burn, "want[ing] to die."

The other tenants of the four-unit apartment building became aware of the fire. Two men were home in the unit on the second floor across the landing from defendant's unit; the two units were about three feet apart. One of the men jumped out of a second-story window to escape the fire, but the other tried to run out the front door. When he opened the door, the fire flashed into the apartment, burning him and blocking his escape. Eventually, he was able to escape by jumping out his living room window. He sustained serious burns resulting in three months of hospitalization and two months of inpatient rehabilitative care. He has scars from the burns on his arm, near his neck, and on his shoulder.

A family was also in the building at the time. A mother and her two daughters were in the unit below defendant's apartment; the father was grilling behind the building. All four were able to escape without being physically harmed.

As the building's tenants and other people in the neighborhood began to gather in the parking lot, defendant sat in her apartment window, refusing to come down. They tried to help her escape but she fought back and yelled at her neighbors, including telling them to "go back inside" and that she "wanted [them] to burn with her." When emergency responders arrived, she resisted their efforts to remove her from the building, but they eventually succeeded.

For that conduct, defendant was charged with five counts of attempted first-degree murder, ORS 161.405 (Counts 1 through 5), five counts of first-degree arson, ORS 164.325 (Counts 6 through 10), two counts of second-degree assault, ORS 163.175 (Counts 11 and 12), and two counts of first-degree criminal mischief, ORS 164.365 (Counts 13 and 14).

Defendant waived her right to a jury trial and the case was tried to the bench. Defendant raised the defense of partial responsibility under ORS 161.300. She urged the court to acquit her on the first-degree arson counts and

instead find her guilty of the lesser-included offense of reckless burning, ORS 164.335.[3]

The court ultimately found that defendant did not have the specific intent to hurt anyone else or take another's life, but that she did "intentionally set that fire [and] *** intentionally damaged property either hers or another person's and thereby recklessly placed others in danger of physical injury." It rejected defendant's contention that, as a result of the evidence of her mental condition, she lacked the requisite mental state for first-degree arson: "[D]espite [defendant's] mental health considerations, I find that she was not so out of her mind that she didn't take volitional steps to accomplish that[.]" Based on those findings, the court acquitted defendant of Counts 1 through 5, attempted murder in the first degree, and Count 11, second-degree assault. The court found her guilty on Counts 6 through 10, which merged to one count of first-degree arson, and a lesser-included offense for Count 12, third-degree assault.[4] The court rejected the possibility of categorizing the fire as a reckless burn because it found that defendant had "an intent to start a fire, [] it wasn't an accident."

At sentencing, defendant relied on *Rodriguez/Buck* to argue that the mandatory minimum 90-month sentence for first-degree arson under ORS 137.700(2)(b)(A) was unconstitutionally disproportionate as applied to her crimes. She asserted that "the constitution exists to say [that mandatory sentences apply] unless it's something so severe that it doesn't make sense, and it does not make sense to put this person in prison for 90 months right now."

---

[3] ORS 164.335(1) provides that "[a] person commits the crime of reckless burning if the person recklessly damages property of another by fire or explosion." Reckless burning is a Class A misdemeanor. ORS 164.335(2).

[4] Third-degree assault, ORS 163.165, includes but is not limited to conduct of a person who

"(a) Recklessly causes serious physical injury to another by means of a deadly or dangerous weapon;

"(b) Recklessly causes serious physical injury to another under circumstances manifesting extreme indifference to the value of human life;

"(c) Recklessly causes physical injury to another by means of a deadly or dangerous weapon under circumstances manifesting extreme indifference to the value of human life[.]"

The state argued that defendant's conduct was not conduct that barely qualified under the statute, as was the case in the proportionality analysis laid out in *Rodriguez/Buck*. On the contrary, her conduct precisely fit the elements of ORS 164.325, first-degree arson, and went further by not only representing a threat of serious physical injury, but also causing it. Additionally, comparing the sentence to sentences given for related crimes, such as different degrees of arson, "weighs in favor of finding proportionality." The state argued that the absence of a criminal history is not relevant because the questions of proportionality are not close enough for defendant's lack of criminal history to make a difference. The state also argued that the only mental diagnosis relevant to the crime is a "short-term substance-abuse-induced psychosis," and that Oregon sentences for crimes committed under those conditions "never shocked the conscience[.]" (Citing *State v. Gee*, 156 Or App 241, 965 P2d 462 (1998), *adh'd to as modified on recons*, 158 Or App 597, 976 P2d 80 (1999); *State v. Shaw*, 233 Or App 427, 225 P3d 855, *rev den*, 348 Or 415 (2010).) Finally, the state asserted that the only mental condition that can be taken into consideration under *Rodriguez/Buck* is intellectual disability—which does not apply to defendant.

The court concluded that the 90-month mandatory sentence for first-degree arson violated Article I, section 16. The court first walked through the specific factors identified in *Rodriguez/Buck* to assess whether "this [is] the rare circumstance *** that the punishment is disproportionate to the crime and [shocks] the moral sense of reasonable people[.]" In evaluating the gravity of the offense under the first *Rodriguez/Buck* factor, the court noted that defendant's conduct was the result of her "downward spiral" and "hit[ting] rock bottom," that she did not know at the time of starting the fire whether any other residents were present, and that she did not know the victims other than knowing that they lived in the same building. The court further noted that defendant's conduct resulted in emotional injury to several people, and serious physical injury to one person.

The court agreed with the state that the sentence was not disproportionate in relation to the elements and resulting sentences of similar crimes. It also noted that

defendant had no prior criminal history and that, while that fact is not sufficient to determine proportionality, it is a factor to be taken into consideration.

Finally, the court stated that the *Rodriguez/Buck* factors "are not exclusive," and that "the court found in *State v. Sanderlin*[, 276 Or App 574, 575-77, 368 P3d 74 (2016),] that the trial court could consider mitigating facts in assessing moral culpability." For that reason, the court "[found] it appropriate to consider the psychological paradigm of [defendant], all factors internal and external as a factor in the determination of proportionality."

The court then recounted the facts of defendant's life from childhood to indictment, conviction, and sentencing for first-degree arson. Among other things, it found that "the defendant had a history of adverse childhood experience." It found that defendant's husband had a history of substance abuse and provided inconsistent support for the couple's children. It found that

> "[defendant] in her psychological paradigm reports a history of domestic violence that includes strangulation, slamming her head into a wall, her husband reportedly isolated her from her family, planted seeds of paranoia, and enabled and encouraged intermittent drug use, first prescription and then methamphetamine."

All this has resulted in defendant "act[ing] out her emotions in maladaptive ways" when overwhelmed.

The court further found that in the months leading up to the fire, defendant had attempted suicide on three occasions. The court noted that before the case in question, "defendant went through her life without any criminal justice interaction, until after three suicide attempts, an eviction notice, lost children, her husband's continued attempts to control her and harass her, the maelstrom existed that caused her to snap."

The court also found that, post-arrest, defendant's condition improved consistently while in custody. After serving two years in jail pending trial, defendant was released and voluntarily sought help for her condition. The court found that defendant was remorseful and, pending trial, "served two years in and out of custody without incident."

Based on all those facts, the court then concluded that the mandatory 90-month sentence would violate Article I, section 16:

> "On its face it is a Ballot Measure 11 offense with a 90-month presumptive prison sentence. However, for reasons that I have stated and in view of the other facts surrounding [defendant's] life, I am led to the conclusion that a 90-month sentence would constitute cruel and unusual punishment and be disproportionate as applied. I don't come upon this decision lightly, I have considered and reconsidered case law, arguments, evidence. I have—this has been probably the most difficult case that I have had, but I do find it unconscionable to follow legislation in a vacuum and without context. This is a case that calls for an incisive departure and I do find that it is one of the rare cases that would shock the conscience of reasonable people, giv[en] all of the reasons that I have indicated."

The court then noted that it was not relieving defendant of the consequences of her actions. It then departed from both ORS 137.700 and the guidelines range during sentencing. It sentenced defendant to 60 months of supervised probation with orders to complete drug addiction and mental health treatment. Defendant also stipulated to a 90-month incarceration sentence in the event of probation being revoked, including in the event of her failure to make restitution payments.[5] The state appealed.

On appeal, both parties revive their arguments on the proportionality of the mandatory minimum sentence prescribed for first-degree arson under ORS 137.700. Based on those arguments, the state contends that (1) the trial court erred in the scope of information about the defendant that it considered in its constitutional proportionality analysis, and (2) even if those considerations were permitted, the trial court still erred by finding disproportionality and departing from the mandatory sentence prescribed by ORS 137.700. Defendant, in response, argues that the court permissibly considered the sum of her circumstances in determining whether her sentence was proportional and correctly determined that the 90-month sentence for first-degree arson is

---

[5] At the time of the trial court's judgment, restitution and attorney fees were set to be determined at a later date.

one that, as applied to defendant, violates Article I, section 16.

## ANALYSIS

Before turning to the legal issue, we start by recognizing the trial court's struggle with this case. The trial court sought to impose what, in its judgment, would be a just sentence. Many of the circumstances that the trial court identified as bearing on its decision—such as the constellation of events that led defendant to commit her crimes, defendant's post-arrest conduct, her remorse, and her efforts at recovery—are ones that weigh in favor of leniency, or so a reasonable judge could conclude.[6] And, as Justice Balmer noted in his concurring opinion in *Ryan*, a more "just and nuanced" sentencing scheme would allow trial courts some discretion to consider at least some individual circumstances when determining an appropriate sentence for a particular offender:

> "I agree with defendant that a just and nuanced sentencing policy would give a judge at least some discretion, in imposing a criminal sentence, to take into account personal characteristics, including intellectual disability, and the possibility that an intellectually disabled person may be less morally culpable in some sense for his or her criminal conduct than a person whom defendant describes as 'normally abled.' In my view, the legislature should revisit the statutes that prevent courts from considering, when imposing a Measure 11 sentence, intellectual disability, youth, immaturity, or other mental or psychological limitations that may affect behavior. Appropriate legislation

---

[6] We note that a defendant's difficult childhood, amenability to treatment, and likelihood of an alternative sentence better serving any penological purpose have all been acknowledged as mitigating factors in capital and guidelines sentencing, both of which allow for discretionary choices in sentencing. *See, e.g.*, *Montez v. Czerniak*, 355 Or 1, 23, 322 P3d 487, *adh'd to as modified on recons*, 355 Or 598, 330 P3d 595 (2014) (childhood abuse and drug and alcohol use in capital case); OAR 213-008-0002(1)(a)(I) (amenability to treatment and likelihood that a "probation sentence will serve community safety interests" mitigating factors in guidelines sentencing). It is possible that some governors might also view such factors as relevant to the question whether to exercise their discretionary and plenary clemency power under Article V, section 14, of the Oregon Constitution to commute a sentence; that choice to commute a lawful sentence prescribed by the legislature and imposed by the judiciary is, of course, one that belongs solely to the Governor, not to the legislative branch and not to the judicial branch. *See Marteeny v. Brown*, 321 Or App 250, 291-92, 517 P3d 343, *rev den*, 370 Or 303 (2022).

would give the courts discretion to impose a sentence more tailored to a particular defendant and crime, rather than imposing the current mandatory minimum sentence; and perhaps also could provide additional guidance as to the kinds of personal characteristics that may affect a defendant's legal culpability and, if reduced culpability is found, the relationship between that reduced culpability and the kind of sentence that would be proportionate to the defendant's offense."

*Ryan*, 361 Or at 628 (Balmer, C. J., concurring).

Despite those admonitions from a former Chief Justice that a "just and nuanced sentencing policy" would allow a sentencing judge to consider factors like those considered by the trial court here, the legislature has not taken that approach. Had it granted the sentencing court that discretion, we might well be in a position to affirm; a reasonable sentencing court could conclude that on the circumstances present here, the 90-month sentence might not be the best way to punish defendant while promoting her reformation. *See* Or Const, Art I, § 15 ("Laws for the punishment of crime shall be founded on these principles: protection of society, personal responsibility, accountability for one's actions and reformation."). But the legislature has not taken that approach; it has, instead, elected to require many mandatory sentences, including a 90-month sentence for conduct constituting first-degree arson, no matter what an individual's circumstances may be.

As a result, the question before us is not whether the trial court acted reasonably in sentencing defendant as it did, given defendant's individual circumstances. Instead, the inquiry under Article I, section 16, as construed in *Ryan*, is different. As we understand *Ryan*, it carves out a narrow exception to allow for a court to consider whether an offender's intellectual disability, brain injury, or the like, effectively means that the offender's "age-specific intellectual capacity fell below the minimum level of criminal responsibility for a child." *Ryan*, 361 Or at 625-26. In those circumstances, a mandatory sentence is "arguably unconstitutional" to the extent it results in an offender being treated more harshly than a child. *Id*. at 626. Although the *Ryan* court did not fully explain its rationale for that conclusion, it appears to

us to flow from the notion that the proportionality of a sentence for an adult offender with the intellectual capacity of a child should be assessed by comparing the presumptive sentence for an adult with the consequences, if any, that would be imposed on a child for the same conduct, in view of the *legislative* judgment that children generally should be treated more leniently than adults. *Id*. at 623-24 (relying on the "legislative pronouncement" regarding the "minimum age for establishing criminal responsibility of a child").

Consistent with that analysis, our cases both before and after *Ryan* have restricted the consideration of a defendant's personal characteristics to those affecting intellectual capacity. *See, e.g.*, *Sanderlin*, 276 Or App at 575-77 (brain damage); *Ryan*, 361 Or at 616 (intellectual disability); *State v. Allen*, 294 Or App 301, 316, 432 P3d 250 (2018) ("transience of defendant's youth and any concomitant susceptibility to reformation").

In this case, unlike in *Ryan*, defendant does not contend that, because of intellectual disability or otherwise, she was functioning at the level of a child so as to allow for the conclusion that the mandatory sentence would be disproportionate to how a child would be treated under the law. Although the facts found by the trial court would be relevant to the question of leniency in a situation where the court had sentencing discretion, they do not readily speak to the issue of whether a 90-month sentence is proportional to the crime of first-degree arson for defendant's conduct. In particular, the many challenges that defendant has faced throughout her life and her post-offense recovery do not bear, in any objective way, on whether defendant should be viewed as less culpable for setting the fire, or on whether the fire, and the significant harm it caused, should be viewed as anything other than grave.

As for defendant's mental health condition, the trial court explicitly found that defendant acted with the requisite culpability, after taking into account her mental health conditions.[7] Furthermore, in contrast with *Ryan*, defendant

---

[7] The court found that "despite [defendant's] mental health considerations, I find that she was not so out of her mind that she didn't take volitional steps to accomplish that[.]"

has not identified any statutory or other basis for conclud-
ing that there is a "societal standard that eschews" treat-
ing persons with defendant's mental health attributes the
same way that other adults are treated where, as here, they
are found to have acted with the requisite culpable mental
state, notwithstanding the presence of mental health issues.
Rather, the law accounts for how mental health conditions
may affect culpability by allowing the introduction of evi-
dence of mental health conditions for the purpose of demon-
strating diminished capacity, insanity, or that the mental
health condition "is relevant to the issue of whether the actor
did or did not have the intent which is an element of the
crime," ORS 161.300. *See generally* ORS 161.295 - 161.309.
Because such conditions—and their relationship to criminal
culpability—are taken into account in the determination
of guilt in the first instance, it is difficult to see how such
conditions might then also be relevant, in the context of pro-
portionality analysis under *Ryan*, to show that a defendant
should be viewed as less culpable than other defendants
found to have acted with the same culpable mental state,
absent the same sort of legislatively recognized societal
standard on which the *Ryan* court relied.

We turn to the legal question of whether the
90-month sentence is proportional to defendant's crime of
first-degree arson, excluding from our consideration those
circumstances that we have concluded exceed the scope of
the inquiry authorized under *Ryan*.

As mentioned, the first factor requires weighing
the gravity of defendant's crime against the severity of 90
months' imprisonment, the mandatory minimum sentence
required by ORS 137.700(2)(b)(A). As described above, under
*Rodriguez/Buck*, we assess the gravity of the crime by exam-
ining the description of the conduct prohibited by the statute
under which defendant was convicted, including the range
of conduct prohibited by the statute, and then examine the
facts of defendant's case to assess where defendant's conduct
fits within that range. *Rodriguez/Buck*, 347 Or at 61. For
purposes of Article I, section 16, where a statute criminal-
izes a broad range of conduct and the defendant's conduct
is on the less-egregious end of the range, then defendant's
crime is treated as less grave for purposes of proportionality

assessment. *Id*. The severity of the sentence, as noted, is measured primarily by its length. *Id.* at 58.

Applying that analysis here, a 90-month sentence unquestionably results in a substantial deprivation of liberty; it is a long time to be separated from society, family and friends, and a long time to be separated from employment and educational opportunities available to people who are not incarcerated. It is a severe sentence.

At the same time, defendant's crime was grave. ORS 164.325(1)(a)(B), under which defendant was convicted, punishes a narrow range of conduct: intentionally damaging, by starting a fire,

   "[a]ny property, whether the property of [defendant] or the property of another person, and such act recklessly place[d] another person in danger of physical injury or protected property of another in danger of damage[.]"

ORS 164.325(1)(a)(B). Defendant's conduct falls within the core of that prohibition, not at its margins. Her conduct not only placed five other people in danger of physical injury, as required by the statute, her conduct also, in fact, caused serious physical injury to one of those people. Though there is no evidence indicating whether she was aware that her neighbors were home, in finding defendant guilty, the trial court found that, notwithstanding her mental health issues, defendant acted both "volitionally" and "recklessly" with respect to the risk of harm that she posed to her neighbors. The trial court's finding that defendant acted recklessly with respect to the risk of harm her conduct posed means that the court found that, notwithstanding her mental health condition, defendant was "aware of the risk" to her neighbors and "consciously disregard[ed] it." *State v. Hill*, 298 Or 270, 279, 692 P2d 100 (1984).

Under those circumstances, it would be difficult to conclude that the 90-month sentence applicable to defendant's conduct is so disproportionate as to shock the moral conscience of all reasonable persons. Although the sentence is a long one, defendant, aware of the risk that she posed to others, disregarded that risk and set fire to her apartment building, forcing her neighbors out of their apartments to

escape the fire, causing severe burns to one neighbor, and damaging the apartment building.

As for the balance of considerations applicable to the proportionality analysis, defendant does not suggest that the mandatory 90-month sentence for first-degree arson is disproportionate when compared to penalties for similar offenses. Further, as the state correctly points out, because defendant's conduct did not just threaten, but actually caused, a permanent injury to one victim, had she been sentenced under the guidelines, the trial court may have been permitted to sentence defendant to up to a sentence of 116 to 120 months' incarceration, even absent prior criminal history, if it found substantial and compelling reasons to do so. OAR ch 213, App 1 (guidelines grid); OAR 213-008-0002 (1)(b)(I). That the 90-month mandatory sentence is shorter than the potential guidelines sentence for arson that causes permanent injury again makes it difficult to conclude that a 90-month sentence is disproportionately long for defendant's conduct. Finally, although defendant had no prior criminal history, that does not demonstrate that defendant's sentence is disproportionate on these facts, given the grave nature of defendant's offense, the harm caused, and the fact that the guidelines potentially allow for an even longer term of incarceration for someone without a criminal history who commits arson resulting in permanent injury to another.

For those reasons, the trial court erred in concluding that defendant's sentence violated Article I, section 16. We therefore reverse and remand for the court to impose the statutorily required 90-month sentence.

Reversed and remanded.