380 December 6, 2023 No. 636

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MARTY ANWAR JEFFERY,
*Defendant-Appellant.*

Washington County Circuit Court
20CR31252; A176879

Janelle F. Wipper, Judge.

Argued and submitted April 26, 2023.

Sara F. Werboff, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Doug M. Petrina, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Shorr, Presiding Judge, and Mooney, Judge, and Pagán, Judge.

PAGÁN, J.

Affirmed.

Mooney, J., dissenting.

**PAGÁN, J.**

Defendant was convicted of first-degree robbery, ORS 164.415, and sentenced to 90 months in prison, ORS 137.700(2)(a)(R). On appeal, defendant's primary argument is that the length of his sentence is constitutionally disproportionate when compared to the gravity of his offense. Applying *State v. Rodriguez/Buck*, 347 Or 46, 217 P3d 659 (2009), we conclude that defendant's sentence, while severe, does not constitute one of those rare circumstances that requires reversal under Article I, section 16, of the Oregon Constitution. At the sentencing hearing, defendant presented conflicting evidence regarding whether he suffered from schizophrenia, but we do not read the Supreme Court's decision in *State v. Ryan*, 361 Or 602, 396 P3d 867 (2017) as requiring the trial court to make findings regarding that evidence. Instead, as we recently explained in *State v. Gonzalez*, 326 Or App 587, 601, 534 P3d 289 (2023), "our cases both before and after *Ryan* have restricted the consideration of a defendant's personal characteristics to those affecting intellectual capacity." Although there was some evidence in the record that defendant may have suffered from schizophrenia, there was also evidence suggesting he did not, and we do not think that the trial court's failure to expressly discuss that evidence constitutes error. The more significant mitigating factors in this case concerned defendant's specific conduct. Focusing on the circumstances of defendant's offense and comparing it to the range of conduct described in the statute for first-degree robbery, we conclude that defendant's offense was sufficiently grave such that the penalty imposed was not unconstitutional.

In his other two assignments of error, defendant challenges the trial court's failure to merge the verdicts on various counts. As we explain below, one of those arguments is moot, and we reject the other argument. We therefore affirm.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On July 7, 2020, Weldon Shields and Kristian Henriquez worked as asset protection specialists or loss

prevention officers (LPOs) at a Fred Meyer store in Beaverton. They were wearing plain clothes. Shields worked on the floor, while Henriquez observed the store using cameras.

Shields noticed that defendant had many items in his shopping cart, and Shields saw defendant picked up a pair of "Skullcandy headphones" and put them in his cart without looking at the price. Shields told Henriquez to look on the cameras "for the individual that seems to be homeless." Shields observed defendant put some items into his backpack and pockets. The items were primarily food, but also the headphones and a lighter. Defendant "ditched the cart," put the backpack on, and exited the store without paying for the merchandise.

Shields followed defendant outside and notified Henriquez to join them. It was windy outside. When Shields was about seven or eight feet away from defendant, and while Henriquez was approaching from a different part of the store, Shields identified himself as part of Fred Meyer Asset Protection, and said, "'Hey. I need to talk to you about the unpaid-for merchandise that you have on you.'"

Defendant turned around and looked at Shields. Shields saw defendant pull something out of his right pocket, reach over with his left hand, and then Shields saw "a reflection." Shields believed it was a blade or a knife. Shields heard defendant say something like, "'I'm not giving you your stuff back,'" or "'Don't come near me.'" Henriquez thought defendant said, "'Don't come near me.'"

Shields was concerned, and he told Henriquez to "'[b]ack up because he has a knife.'" Defendant did not gesture with the knife or come towards Shields. Instead, defendant simply displayed the knife and continued walking away from the store. At first, Henriquez did not see the knife, but he saw it in defendant's right hand when Shields pointed it out. Shields called 9-1-1.

Officer Kartchner, who worked as a patrol officer for the Beaverton Police Department, responded to the call and arrived about three minutes later. Kartchner located defendant near a restaurant across the street from the store. When Kartchner made contact with defendant,

defendant was wearing earphones,[1] but defendant did not have a problem hearing the officer or responding to the officer's commands.

The officer located the pocketknife. Defendant described it as a can opener. Defendant admitted displaying it while in the parking lot of the store, but he said that he took it out as protection because he did not know who the LPOs were, and he had been assaulted three times. When asked by the officer whether he had opened the blade of the pocketknife, defendant stated, "I probably did, yeah." Defendant added that the persons were far behind him, and he "had no intention of getting closer to them with it." The merchandise that defendant took from the store had a value of $41.78.

Defendant was charged with first-degree robbery, ORS 164.415 (Count 1), second-degree robbery, ORS 164.405 (Count 2), unlawful use of a weapon (UUW), ORS 166.220 (Count 3), and third-degree theft, ORS 164.043 (Count 4).

After the charges were filed, defendant was evaluated by three different psychologists. James Andretta, Ph.D., diagnosed defendant as suffering from schizophrenia based on defendant's "disconnection and distancing from social relationships, his mumbling to himself in a way that was in keeping with the experience of internal stimuli, his assertion of fixed false beliefs, and his mildly disorganized speech." Dr. Andretta acknowledged that defendant had a history of using methamphetamine, but he did not think that defendant's drug use explained his symptoms because they manifested earlier in defendant's life. Based on his diagnosis, Dr. Andretta did not believe that defendant could aid and assist in his defense.

At the state hospital, a second psychologist evaluated defendant for the purpose of determining whether he could proceed to trial. Kordell Kennemer, Psy. D., observed that the defendant "did not appear distracted during the evaluation and did not appear to be responding to internal stimuli." In his view, defendant's symptoms were "less severe than what was observed by Dr. Andretta. It is possible that

---

[1] They were not the same headphones that defendant took from the store.

his symptoms may be remitting over time and that they were substance-induced." Dr. Kennemer diagnosed defendant with "[s]chizophrenia spectrum and other psychotic disorder" and substance use disorders. Dr. Kennemer concluded that defendant could proceed to trial.

A third psychologist, Alexander Millkey, Psy. D., evaluated defendant to determine whether he suffered from a qualifying mental disorder that impacted his ability to form the intent to commit the charged crimes. Dr. Millkey noted that, by the time of his evaluation, defendant's "symptoms appear to have entirely abated without treatment with psychotropic medications." Dr. Millkey opined that defendant experienced "an unusually protracted methamphetamine-induced psychotic state," and "it is more parsimonious to attribute the symptoms he experienced to amphetamine use rather than to [s]chizophrenia or another chronic mental illness." According to Dr. Millkey, defendant did not have a qualifying mental disorder. Before trial, defendant raised a "disordered mental state defense," but he withdrew it at the beginning of trial.

Defendant waived his right to a jury trial. The trial judge heard testimony from the LPOs, Kartchner, and defendant. The judge also watched body camera footage of Kartchner's contact with defendant. A photograph of the pocketknife was received into evidence. At trial, Kartchner testified that the blade of the pocketknife was about two to three inches long. Defendant testified that he was listening to music on his earphones when he left the store, and he did not hear Shields announcing himself as an LPO.

The trial judge found defendant guilty of the charges. Before his sentencing hearing, defendant filed a sentencing memorandum arguing, among other things, that a 90-month sentence for defendant's offense would be constitutionally disproportionate. Defendant's memorandum discussed the three psychological evaluations. At the hearing, the trial court imposed the mandatory minimum sentence. The trial judge stated:

"[T]he only way for me to come off of the 90 months is to make certain findings.

"And, given my experience and the particulars of this case, unfortunately for you, it doesn't qualify. These are the same types of cases that the Court imposes similar sentences to.

"And so, legally, based on the statute and the cases that both the attorneys have talked about, that is not something that allows me to find that your case is constitutionally disproportionate to other cases. Obviously, you are an individual, but, in terms of what I can do for you, given that it's a Measure 11 Robbery in the First Degree, I don't think that that applies in your case."

The trial court entered a judgment, which was later amended. Defendant was sentenced to 90 months in prison on Count 1 (first-degree robbery), a concurrent 70-months in prison on Count 2 (second-degree robbery), a concurrent 6-month jail term on Count 3 (UUW), and the trial court merged the verdicts on Count 4 (third-degree theft) and Count 1 (first-degree robbery). Defendant appeals.

## II. ANALYSIS

A. *Defendant's 90-month sentence for first-degree robbery is not constitutionally disproportionate.*

We focus on defendant's third assignment of error in which he argues that the mandatory minimum sentence of 90 months for first-degree robbery is constitutionally disproportionate as applied to him. "We review for legal error the trial court's conclusion that defendant's sentence was constitutional under Article I, section 16." *Ryan*, 361 Or at 614-15.

Article I, section 16, provides, in part, that "all penalties shall be proportioned to the offense." In considering that proportionality requirement, we ask whether the length of the sentence would "shock the moral sense of reasonable people." *Ryan*, 361 Or at 612. That standard will be satisfied rarely because it is the province of the legislature (or the people, when acting in their legislative capacity) to determine the appropriate penalty for a crime, and it is "not the role of this court to second-guess the legislature's determination of the penalty or range of penalties for a crime." *Rodriguez/Buck*, 347 Or at 58. Nevertheless, we do play a role in ensuring that sentences conform to the requirements

of our state constitution. *See*, *e.g.*, *State v. Davidson*, 360 Or 370, 372, 380 P3d 963 (2016) (concluding that life imprisonment without the possibility of parole was unconstitutionally disproportionate as applied to the defendant, who had two prior felony convictions for public indecency, and who was convicted of two counts of public indecency for exposing himself in a park).

When considering an as-applied constitutional challenge to a sentence, the Supreme Court has identified three nonexclusive factors for courts to consider: "(1) a comparison of the severity of the penalty and the gravity of the crime; (2) a comparison of the penalties imposed for other, related crimes; and (3) the criminal history of the defendant." *Rodriguez/Buck*, 347 Or at 58.

Under the first *Rodriguez/Buck* factor, the amount of time is the "primary determinant" of the severity of the penalty. *Id*. at 60. When comparing the offense and the sentence, the offense is not limited to the description of the prohibited conduct in the statute. *Id*. at 61. It includes "the specific defendant's particular conduct toward the victim that constituted the crime." *Id*. at 62. In determining the gravity of the offense, we consider the circumstances of the defendant's specific conduct and place it on the range of prohibited conduct. *Id*. at 62, 69-70.

"An as-applied proportionality analysis that considers the facts of an individual defendant's specific criminal conduct is particularly significant when the criminal statute at issue covers a broad range of activity, criminalizing a variety of forms and intensity of conduct. In such a case, a harsh penalty might not, on its face, be disproportionate, because of the fact that the statute dealt, *inter alia,* with some extreme form of that conduct. However, when a defendant is convicted for engaging in only more minor conduct encompassed within the statute, the defendant may plausibly argue that the mandatory sentence, as applied to the particular facts of his or her case, is unconstitutionally disproportionate."

*Id*. at 61. When assessing whether a penalty is disproportionate,

"a court may consider, among other things, the specific circumstances and facts of the defendant's conduct that come

within the statutory definition of the offense, as well as other case-specific factors, such as characteristics of the defendant and the victim, the harm to the victim, and the relationship between the defendant and the victim."

*Id*. at 62.

Under the second *Rodriguez/Buck* factor, we compare the imposed penalty to penalties for related offenses. *Id*. at 63. And under the third *Rodriguez/Buck* factor, we consider the defendant's criminal history, which is relevant "because a defendant who previously has been convicted of and served sentences for other crimes has demonstrated, by committing additional crimes, that the previously imposed sentences were insufficient to prevent the defendant from returning to his or her criminal behavior." *Id*. at 77.

Applying those factors here, we begin by comparing the severity of the penalty to the gravity of the offense. As a result of the passage of Ballot Measure 11 in 1994, the penalty for first-degree robbery is a mandatory term of 90 months in prison. ORS 137.700(2)(a)(R). "[A] 90-month sentence unquestionably results in a substantial deprivation of liberty; it is a long time to be separated from society, family and friends, and a long time to be separated from employment and educational opportunities available to people who are not incarcerated. It is a severe sentence." *Gonzalez*, 326 Or App at 603.

Turning to the gravity of the offense, the statute for first-degree robbery, ORS 164.415, describes a broad range of conduct. It provides, in part:

"(1)  A person commits the crime of robbery in the first degree if the person violates ORS 164.395 and the person:

"(a)  Is armed with a deadly weapon;

"(b)  Uses or attempts to use a dangerous weapon; or

"(c)  Causes or attempts to cause serious physical injury to any person."

ORS 164.397, the statute for third-degree robbery, provides, in part:

"(1)   A person commits the crime of robbery in the third degree if in the course of committing or attempting to commit theft *** the person uses or threatens the immediate use of physical force upon another person with the intent of:

"(a)   Preventing or overcoming resistance to the taking of the property or to retention thereof immediately after the taking; or

"(b)   Compelling the owner of such property or another person to deliver the property or to engage in other conduct which might aid in the commission of the theft ***."

As the Supreme Court has explained it,

"Third-degree robbery is the least serious and describes the basic crime of robbery: taking or attempting to take property from another, while preventing or overcoming the victim's resistance to giving up the property by using or threatening to use physical force. The crimes of second- and first-degree robbery then use third-degree robbery as a foundation and build on its elements by identifying additional elements that, if present, make the crime a more serious one. The highest level of robbery, first-degree robbery, is a robbery in which the robber is armed or actually causes or attempts to cause the victim serious injury."

*State v. White*, 346 Or 275, 285-86, 211 P3d 248 (2009) (citations and footnotes omitted).

Clearly, ORS 164.415 describes a wide range of circumstances that can elevate a theft to first-degree robbery, including when there are threats of the use of force, and when the conduct does or does not result in serious physical injury to others. *See*, *e.g.*, *Martinez v. Cain*, 366 Or 136, 138, 458 P3d 670 (2020) (defendant shot the victim while attempting to steal the victim's wallet and car); *State v. Osborne*, 242 Or App 85, 87, 255 P3d 513 (2011) (defendant, while holding a folding knife with a short blade, told a store clerk to give him the money in the cash register, he apologized to her as she did so, and he then fled the store); *State v. Melillo*, 160 Or App 332, 336, 982 P2d 12, *rev den*, 329 Or 438 (1999) (defendant was the "wheel man" for his armed co-defendant and the crime involved the use of a gun).

Here, although defendant's conduct was relatively minor when considered in the context of the range of activity

encompassed by ORS 164.415(1), there are some circumstances that make his offense more serious. On the one hand, defendant's conduct did not result in physical harm, defendant did not target an individual for robbery, he did not move toward the LPOs after displaying the pocketknife, or otherwise brandish it, the pocketknife consisted of a small blade, and the items stolen for the store, which consisted primarily of food, were valued at a little over $40. But, on the other hand, when confronted by the LPOs, defendant took the pocketknife out of his pocket and opened the blade, he told the LPOs that he would not return the items or not to come near him, and Shields testified that he was concerned for their safety. That second set of circumstances created the potential for violence, and they move defendant's conduct closer to the midrange of activity encompassed by the first-degree robbery statute. *See White*, 346 Or at 287 ("What the statutes and the legislative history indicate is an incremental classification, not of levels of actual violence during the commission of a robbery, but of levels of the potential for violence, including its potential extent.").

The circumstances, of course, also include the defendant's personal characteristics, and, in *Ryan*, the Supreme Court held that an offender's personal characteristics may, in some cases, be relevant to the assessment of the gravity of an offense. 361 Or at 616. Defendant suggests that, at the time of the offense, he suffered from schizophrenia, and that his mental condition should be considered as part of the *Rodriguez/Buck* analysis. Indeed, defendant argues that the trial court was required to consider his mental condition, and it "may have reduced his culpability for the offense."

At the sentencing hearing, the trial judge made no express findings regarding defendant's mental condition, but there is nothing in *Ryan* that indicates that the trial judge was required to do so. In *Ryan*, the Supreme Court determined that when there is evidence of an intellectual disability, then the trial court must address that evidence in comparing the gravity of an offense with the severity of a Measure 11 sentence. 361 Or at 624-25. Evidence of an intellectual disability is significant because it may mean that an offender is operating with the intellectual capacity

of a child, and there are laws establishing that children should be treated more leniently than adults. *Id.* at 623-26. But here, there was no argument or evidence that defendant suffers from an intellectual disability. "The court's recognition that an offender's intellectual disability is relevant to the proportionality analysis does not equate to a general rule that an offender's other individual characteristics are relevant to the analysis." *Gonzalez*, 326 Or App at 592.

As we further explained in *Gonzalez*,

> "[T]he law accounts for how mental health conditions may affect culpability by allowing the introduction of evidence of mental health conditions for the purpose of demonstrating diminished capacity, insanity, or that the mental health condition 'is relevant to the issue of whether the actor did or did not have the intent which is an element of the crime,' ORS 161.300. *See generally* ORS 161.295 - 161.309. Because such conditions—and their relationship to criminal culpability—are taken into account in the determination of guilt in the first instance, it is difficult to see how such conditions might then also be relevant, in the context of proportionality analysis under *Ryan*, to show that a defendant should be viewed as less culpable than other defendants found to have acted with the same culpable mental state, absent the same sort of legislatively recognized societal standard on which the *Ryan* court relied."

*Id.* at 602. Based on our analysis in *Gonzalez*, we disagree with defendant's claim that the trial judge, in sentencing defendant, was required to make findings based on the conflicting evidence in the record regarding defendant's mental health.

Clearly, the court considered that evidence because defendant relied on it at the sentencing hearing. However, in this case, the more significant mitigating circumstances concerned the nature of defendant's conduct, including the fact that defendant caused no harm, defendant did not target a specific individual, he did not brandish the pocketknife or advance toward the LPOs, and the items taken from the store were valued at only about $40. Here, those circumstances, not his mental condition, are the weighty factors when considering the gravity of defendant's offense.

Given those circumstances, we recognize that the penalty required by the statute is harsh. It may be desirable for trial judges to have more discretion in cases like this one. As explained in the concurring opinion in *Ryan*,

"Appropriate legislation would give the courts discretion to impose a sentence more tailored to a particular defendant and crime, rather than imposing the current mandatory minimum sentence; and perhaps also could provide additional guidance as to the kinds of personal characteristics that may affect a defendant's legal culpability and, if reduced culpability is found, the relationship between that reduced culpability and the kind of sentence that would be proportionate to the defendant's offense.

"But that is not the sentencing law that the people and the legislature have put in place for Measure 11 offenses ***. Oregon's statutory sentencing provisions for Measure 11 offenses permit only the most limited consideration of personal characteristics, degree of culpability, mitigating facts, or the impact of the Measure 11 sentence on a particular defendant."

361 Or at 628 (Balmer, C.J., concurring). We agree with that assessment.

Nevertheless, in the instant case, defendant used a dangerous weapon during the robbery. By unfolding and displaying the blade of his pocketknife when confronted by the LPOs, defendant created a circumstance that was "fraught with the potential for causing fear in the victim and promoting violence." *Melillo*, 160 Or App at 336. Although there are other circumstances that lessen the seriousness of defendant's offense, it was sufficiently grave such that we cannot conclude that the legislatively prescribed sentence for the offense contravenes Article I, section 16.

In arguing otherwise, defendant relies on second-degree robbery cases in which the defendants received 70-month sentences. *See*, *e.g.*, *State v. Bentley*, 301 Or App 347, 350-51, 456 P3d 651 (2019) (trial court acquitted defendant of first-degree robbery because trial court could not infer that defendant knew his accomplice had a gun); *see also State v. George*, 146 Or App 449, 451, 934 P2d 474 (1997) (in a robbery that involved accomplices, defendant did not

use a dangerous weapon). Those cases are not helpful in assessing the proportionality of a sentence for a conviction of first-degree robbery, because, under the first *Rodriguez/ Buck* factor, we must focus on the range of conduct prohibited by the statute for first-degree robbery and where defendant's particular conduct and circumstances fall on that range. *See Rodriguez/Buck*, 347 Or at 60-62.

Regarding the second *Rodriguez/Buck* factor, "[i]f the penalties for more 'serious crimes' than the crime at issue result in less severe sentences, that is an indication that the challenged penalty may be disproportionate." *Rodriguez/ Buck*, 347 Or at 63. In the instant case, defendant makes no argument comparing the imposed penalty to penalties for related offenses—he expressly disavows reliance on the second *Rodriguez/Buck* factor—and we thus do not address it.

With regard to the third factor, defendant claims that his criminal history weighs in favor of departing from the mandatory minimum sentence. We disagree. The record indicates that defendant has prior misdemeanor convictions from Massachusetts for indecent exposure and for walking on a railroad track, and he also has some arrests that did not result in criminal prosecutions. Although his criminal history is minimal, it certainly does not weigh *in his favor* in determining whether his sentence is disproportionate. Instead, it is a factor that weighs against him, albeit slightly, because it has some tendency to show that his prior convictions "were insufficient to prevent the defendant from returning to his or her criminal behavior." *Rodriguez/Buck*, 347 Or at 77.

In arguing otherwise, the dissent is shocked by the length of the sentence in this case. 329 Or App at 396 (Mooney, J., dissenting). For the reasons explained, we agree that the sentence is severe. But to the extent that the dissent focuses on the value of the property stolen, it is straying from the concern underlying robbery statutes. Oregon's robbery statutes do not depend on the value of the goods stolen to determine the severity of the crime, but rather the gravity of the threat of violence. *See White*, 346 Or at 290 ("It is the concept of fear or threat of violence that separates

robbery from mere theft."). The dissent suggests that defendant's conduct amounted to mere theft, but defendant does not challenge his conviction for first-degree robbery.

Having reviewed the arguments regarding the *Rodriguez/Buck* factors, we conclude that defendant's 90-month sentence for first-degree robbery does not contravene Article I, section 16. We therefore reject defendant's third assignment of error.

B. *Defendant's Merger Arguments*

We summarily address defendant's first two assignments. Defendant's first assignment of error is moot because the trial court issued an amended judgment merging the verdicts on Count 4 (third-degree theft) and Count 1 (first-degree robbery). Regarding defendant's second assignment, as explained below, we are not persuaded that the trial court should have merged the verdicts on Count 3 (UUW) and Count 1 (first-degree robbery).

We review the trial court's merger rulings for legal error. *State v. Ortiz-Rico*, 303 Or App 78, 84, 462 P3d 741, *rev den*, 366 Or 827 (2020). The anti-merger statute provides, in relevant part, that guilty verdicts may not merge when "the same conduct or criminal episode violates two or more statutory provisions and each provision requires proof of an element that the others do not * * *." ORS 161.067(1). "It is not enough to show that one offense has an element that the other does not; the other offense also must have an element that the first does not." *Martinez*, 366 Or at 145. "[W]hen a statute contains alternative forms of a single crime * * *, we will look to the indictment to determine which form is charged, and we use the elements of the charged version in the merger analysis." *State v. Pass*, 264 Or App 583, 587, 333 P3d 1139 (2014).

Here, in Count 1 of the indictment, which charged defendant with first-degree robbery, the state alleged that defendant "use[d] or attempt[ed] to use a dangerous weapon." In Count 3 of the indictment, which charged defendant with UUW, the state alleged that defendant carried or possessed a dangerous or deadly weapon.

Defendant's merger argument is based on the premise that the state cannot prove that a defendant used or attempted to use a dangerous weapon without also proving that the defendant carried or possessed the weapon with the intent to use it unlawfully. We disagree. In *State v. Reed,* 101 Or App 277, 279, 790 P2d 551, *rev den,* 310 Or 195 (1990), focusing on the broad definition of a dangerous weapon in ORS 161.015(1), we determined that the sidewalk was a dangerous weapon for purposes of the assault statute. Thus, "[i]t is possible to inflict serious physical injury with a dangerous or deadly weapon without either possessing or carrying it." *State v. Alvarez*, 240 Or App 167, 173, 246 P3d 26 (2010), *rev den*, 350 Or 408 (2011).

Similarly, here, it is possible that a defendant could commit a theft using a dangerous weapon without carrying or possessing it—for example, using force to strike a victim against a sharp or hard stationary object. Thus, the UUW count contains an element—carrying or possessing a dangerous weapon—that is not one of the elements of first-degree robbery. And the crime of first-degree robbery contains elements that are not contained in the crime of UUW, such as using or threatening the immediate use of physical force upon a person with the intent of preventing and overcoming resistance to the defendant's taking of property. Accordingly, the trial court did not err when it did not merge the verdict on Count 3 (UUW) with the verdict on Count 1 (first-degree robbery). We reject defendant's second assignment of error.

Affirmed.

**MOONEY, J.,** dissenting.

The statutory 90-month prison sentence imposed by the trial court and upheld today by my colleagues is constitutionally disproportionate to the gravity of the criminal offense that defendant committed. The majority correctly recites existing case law, but it misapplies that law to the facts of this case. I would reverse and remand for resentencing.

Defendant shoplifted approximately $40 worth of merchandise from a Fred Meyer store, including food, a pair

of earbuds, and a lighter. He, thus, committed the crime of theft in the third-degree, ORS 164.043, a class C misdemeanor, punishable by up to thirty (30) days in jail and a fine of up to $1,250.

Two Fred Meyer employees, dressed in plain clothes and working in "loss prevention," observed defendant place merchandise into his backpack and leave the store without paying. The employees followed defendant, who appeared to them to be homeless, out of the store and pursued him on foot. It was not apparent from their clothing that the employees worked for Fred Meyer, and they were not wearing store badges or other store insignia. It was a windy day, and defendant was wearing earbuds, listening to music. When they asked defendant to stop and return the items that he had not paid for, the loss prevention employees were separated from him by a distance of eight feet. After hearing the approaching individuals yell at him, defendant pulled a pocketknife out of his pocket and, although he opened it, defendant did not raise or otherwise brandish the pocketknife. In fact, only one of the employees even noticed it. Defendant did not threaten the employees or anyone else with the pocketknife. At most, he declined to return the merchandise that he had taken and told the pursuing employees not to approach him.

Defendant did not target any individual for robbery, and he did not cause physical harm. He did not at any point move toward the Fred Meyer employees. Instead, he walked away from them. Defendant retrieved his pocketknife and opened the small blade when he was approached by the employees, but he did not posture, speak, or move in any way that suggested impending violence. He moved away from them, signaling his plan to avoid contact, not to cause it. Defendant was shoplifting. For that, he was convicted of robbery in the first-degree, ORS 164.415, a class A felony, and the court imposed a sentence of ninety months in prison. ORS 137.700(2)(a)(R).

Article I, section 16, of the Oregon Constitution declares that "[c]ruel and unusual punishments shall not be inflicted, but all penalties shall be proportioned to the offense." The policy choice of what penalty to assign to a particular crime is a legislative decision made by Oregonians

or their elected representatives. Our role is to subject such choices to constitutional scrutiny when they are applied to a particular individual in a particular case. In testing the proportionality of a sentence to a crime we ask whether the sentence would "shock the moral sense of reasonable people." *State v. Ryan*, 361 Or 602, 612, 396 P3d 867 (2017).

The 90-month prison sentence imposed on this defendant fails the test of proportionality. Seven and one-half years in prison for stealing bread and a pair of cheap earbuds without even the threat of violence would, and certainly should, shock the moral sense of reasonable people. This is especially so given that defendant's criminal history consists solely of two misdemeanor convictions: (1) walking on a railroad track and (2) indecent exposure. Neither of those offenses involved violence or physical harm. Not unlike shoplifting small amounts of food or carrying a pocketknife, defendant's past convictions were for conduct much more likely to be associated with homelessness than violence. Defendant was suddenly approached by strangers dressed in street clothing, who were yelling at him. That he responded by holding onto his pocketknife as he walked away from them does not render the 90-month sentence constitutional.

I would hold that defendant's 90-month prison sentence violates Article I, section 16, of the Oregon Constitution. I respectfully dissent.